# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

_____

In the matters of:

**KPH Construction, Corp.,** *et al.,*[1]                    **Case No. 19-20939-BEH**

**Debtors.**

_____

### FIRST AMENDED JOINT PLAN OF REORGANIZATION

_____

Kerkman & Dunn
Attorneys for
KPH Construction, Corp., KPH
Environmental, Corp., and KPH
Construction Services, LLC
839 N. Jefferson St., Suite 400
Milwaukee, Wisconsin 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: jkerkman@kerkmandunn.com

DeMarb Brophy LLC
Attorneys for Keith P. Harenda
and Triple H. Holdings, LLC
East Washington Avenue &
Capitol Square
P.O. Box 631
Madison, Wisconsin 53701
Phone: 608.310.5500
Facsimile: 608.310.5525
Email: rdemarb@demarb-brophy.com

Dated:  Milwaukee, Wisconsin
        February 5, 2020, as modified
        on March 4, 2020, March 20,
        2020, April 3, 2020, May 6, 2020
        and May 13, 2020.

---

[1] Jointly administered with *KPH Environmental, Corp.* (Case No. 19-20940-beh), KPH Construction Services, LLC (Case No. 19-20942-beh), Triple H Holdings, LLC (Case No. 19-20945-beh), and *Keith P. Harenda* (Case No. 19-20944-beh).

KPH Construction, Corp., KPH Environmental, Corp., KPH Construction Services, LLC, Triple H Holdings, LLC and Keith P. Harenda, as chapter 11 debtors-in-possession (collectively, the "Debtors"), propose the following Joint Plan of Reorganization pursuant to § 1121 of the Code:

## ARTICLE I
## DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in the Plan. The terms defined shall be equally applicable to both the singular and plural forms of each term unless the context otherwise requires. Any term used in the Plan that is not defined here, but that is defined in the Code shall have the meaning assigned to that term in the Code. Any term used in initially capitalized form in the Plan shall have the same meaning in the disclosure statement, filed with the Plan, unless the context otherwise requires.

1.1     *Addendum* shall mean an addendum that is attached to the Plan.

1.2     *Administrative Expense* shall mean administrative expenses as defined by § 503(b) of the Code.

1.3     *Allowed Claim* shall mean any Claim (a) with respect to which a proof of claim has been filed with the Bankruptcy Court on or before the date to be fixed as provided by the Bankruptcy Court pursuant to Rule 3003; or (b) scheduled in the list of creditors prepared and filed pursuant to Rule 1007(b) and not listed as disputed, contingent, or unliquidated as to amount; and for either (a) or (b), any Claim for which no objection has been filed within the applicable limitation fixed by Rule 3007 or by a Bankruptcy Court order, or any Claim for which any such objection has been resolved by an order no longer subject to appeal or for which no appeal is pending.

1.4     *Allowed Equity Interest* shall mean an Allowed interest in an ownership of one of the Debtors.

1.5     *Allowed Priority Claim* shall mean an Allowed Claim for which the holder asserts, and is determined to be entitled to, priority under § 507 of the Code or under any other provision of the Code, except for an Allowed Priority Tax Claim.

1.6     *Allowed Priority Tax Claim* shall mean any Allowed Claim within § 507(a)(8).

1.7     *Allowed Secured Claim* shall mean an Allowed Claim secured by a valid and enforceable lien, security interest, mortgage or other recognized interest in property in which the Debtors have an interest, which is not void or voidable under any state or federal law or subject to set off under § 553 of the Code, but only to the extent of the Claim's value pursuant to § 506(a) of the Code.  The portion of an Allowed Claim that is not an Allowed Secured Claim shall be an Allowed Unsecured Claim except as otherwise provided for herein.

1.8     *Allowed Trust Fund Claim* shall mean an Allowed Claim that has rights under Wis. Stat. § 779.16 against a Debtor.

1.9     *Allowed Unsecured Claim* shall mean any Allowed Claim that is not an Allowed Secured Claim, an Allowed Convenience Claim, an Allowed Priority Tax Claim, an Allowed Priority Claim, an Allowed Trust Fund Claim, an Allowed Interest, the Allowed Claim of BMO, or the Allowed Claim of Liberty.

1.10     *Bar Date* shall mean the date fixed by the Bankruptcy Court for Creditors to file a Claim in the Case, which was April 30, 2019.

1.11     *BMO* shall mean BMO Harris Bank, N.A. as the holder of the Allowed Claims in Classes 2A through 2E, or its assigns and successors.

1.12     *Case* shall mean collectively the jointly-administered chapter 11 cases of the Debtors, Case Nos. 19-20939-beh, 19-20940-beh, 19-20942-beh, 19-20945-beh and 19-20944-beh.

1.13    *Cash* shall mean with respect to a payment, a check drawn on a Debtor's bank account which has sufficient funds to pay the check when it is presented to a Debtor's bank.

1.14    *Claim* shall mean any right to payment, or right to an equitable remedy for breach of contract or performance if such breach gives rise to a right of payment, asserted against a Debtor that was in existence on or as of the Petition Date, whether or not the right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured.

1.15    *Claimant* means the holder of an Administrative Expense.

1.16    *Class* shall mean the classes specified in Article II of the Plan.

1.17    *Code* shall mean title 11 of the United States Code as amended from time to time.

1.18    *Collateral* means any property or interest in property of a Debtor or its bankruptcy estate that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

1.19    *Confirmation Date* shall mean the date upon which the Confirmation Order entered pursuant to § 1129 of the Code is entered on the Bankruptcy Court's docket.

1.20    *Confirmation Order* shall mean the order entered by the Bankruptcy Court confirming the Plan.

1.21    *Court* shall mean the United States Bankruptcy Court for the Eastern District of Wisconsin and any federal court with concurrent or appellate jurisdiction.

1.22    *Court-Approved Interest Rate* shall mean the rate of interest determined by the Court that a Debtor is required to pay a Class of Creditors so that the deferred Cash payments to the Creditors in the Class have a value as of the Effective Date equal to the Creditors' Allowed Claim in order to comply with § 1129(b)(2)(A)(i)(II) and (B)(i) of the Code.

1.23    *Creditor* shall mean any Person or entity that has a Claim against the Debtors that arose or is deemed to have arisen on or before the Petition Date, including a Claim against the Debtors' estates under §§ 502(g) or 502(i) of the Code.

1.24    *Cure Amount* shall mean the monetary amount necessary to cure any defaults of an executory contract or unexpired lease through the Confirmation Date.

1.25    *Debtor* shall mean KPH Construction, Corp., KPH Environmental, Corp., KPH Construction Services, LLC, Triple H Holdings, LLC or Keith P. Harenda, as the context requires, and *Debtors* shall mean all five collectively.

1.26    *Disclosure Statement* shall mean the disclosure statement filed by the Debtors pursuant to § 1125 of the Code after it has been approved by an order entered by the Bankruptcy Court.

1.27    *Disputed Claim* shall mean a Claim against the Debtors the allowance of which, in whole or in part, is the subject of a timely objection; provided, however, that for purposes of determining the aggregate amount of Disputed Claims against the Debtors' estates, Disputed Claim shall mean the lesser of (a) the total amount of Disputed Claims as filed with the Bankruptcy Court or (b) the total amount of Disputed Claims as estimated by the Bankruptcy Court pursuant to § 502(c) of the Code; and, provided, further, that in the event the Bankruptcy Court estimated a Disputed Claim for purposes of allowance pursuant to § 502(c), that estimation shall constitute the Allowed Claim.

1.28    *Effective Date* shall mean the date when all of the conditions set forth in Article XI of the Plan have been satisfied or waived.

1.29    *Equity Interests* shall mean the ownership interests in each Debtor.

3

1.30    *Final Order* shall mean an order entered by the Bankruptcy Court as to which the time to appeal or to seek review or rehearing has expired, and as which no appeal or other proceedings for review or rehearing shall then be pending.

1.31    *Harenda* shall mean Keith P. Harenda, one of the Debtors.

1.32    *Hotel Northland Property* shall mean the hotel and property located at 304 North Adams Street, Green Bay, Wisconsin.

1.33    *Insider* shall have the meaning as it is defined in § 101(31) of the Code.

1.34    *Kahler Litigation* shall have the meaning assigned in Section 6.11.

1.35    *KPH Construction* shall mean KPH Construction, Corp., one of the Debtors.

1.36    *KPH Environmental* shall mean KPH Environmental, Corp., one of the Debtors.

1.37    *KPH Services* shall mean KPH Construction Services, LLC, one of the Debtors.

1.38    *Liberty* shall mean Liberty Mutual Insurance Company.

1.39    *Lien* has the meaning assigned to it in § 101(37) of the Code.

1.40    *Master Lease* means the Master Lease Agreement dated December 14, 2015 between Hotel Northland, LLC and Master Tenant.

1.41    *Managing Member* means Hotel Northland Master Tenant Managing Member, LLC which owns at least 1% of the membership interests in the Master Tenant and which Managing Member is managed, owned and controlled by Harenda.

1.42    *Master Tenant* means Hotel Northland Master Tenant, LLC.

1.43    *Octagon Parties* shall mean Octagon Credit Partners, LP, Octagon Finance, LLC, and their respective affiliates, and, including without limitation, the buyer of Hotel Northland from the Receiver, 304 North Adams Green Bay, LLC and 304 North Adams Master Tenant, LLC.

1.44    *Octagon Payment* shall have the meaning assigned in Section 6.12.

1.45    *Person* shall mean any individual, corporation, general partnership, limited partnership, association, limited liability company, joint stock company, joint venture, estate, unincorporated organization, government or any political subdivision thereof, governmental unit, or other entity.

1.46    *Petition Date* shall mean February 6, 2019, the date on which the Debtors filed their voluntary petitions for reorganization under chapter 11 of the Code.

1.47    *Plan* shall mean this chapter 11 joint plan of reorganization and any amendments, modifications or alterations thereto in accordance with the Code.

1.48    *Pro-Rata Basis* shall mean, with respect to any holder of an Allowed Claim, an amount calculated by and reduced to the proportion that the amount of the Claim bears to the aggregate amount of all Claims in the same Class or pool.

1.49    *Receiver* shall mean the receiver appointed by the Receivership Court in the Receivership Case by an order filed on October 9, 2017, including all successors, who as of the Petition Date was Paul G. Swanson, Esq.

1.50    *Receivership Case* shall mean Case No. 17-CV-1133 captioned "In re Hotel Northland LLC"

4

pending in the Circuit Court, Branch VI, for Brown County, State of Wisconsin, and includes all appeals.

      1.51    *Receivership Court* shall mean the Circuit Court, Branch VI, for Brown County, State of Wisconsin, having jurisdiction over Case No. 17-CV-1133, and all appellate courts having matters on appeal from the Receivership Case.

      1.52    *Reorganized Debtor* shall mean a Debtor after the Effective Date.

      1.53    *Section* means a numbered section of the Plan, such as this Section 1.52.

      1.54    *Settlement Agreement* means that certain Settlement Agreement, in the form attached as Addendum 6.12(g) by and among the Debtors, the Receiver, Hotel Northland, LLC, the Octagon Parties, Liberty Mutual, USBCD and the Harenda Related Entities (defined in the Settlement Agreement) which Settlement Agreement is incorporated into the Plan.

      1.55    *Triple H* shall mean Triple H Holdings, LLC, one of the Debtors.

      1.56    *USBCDC* means U.S. Bancorp Community Development Corporation.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

The Plan classifies the Claims against the Debtors as follows:

      2.1    Class 1 shall consist of all Allowed Priority Claims against each Debtor, except those held by Insiders.

      2.2    Class 2 shall consist of all Allowed Secured Claims of BMO against each Debtor.

      2.3    Class 3 shall consist of the Allowed Claims of Liberty Mutual against each Debtor.

      2.4    Class 4 shall consist of the Allowed Trust Fund Claims against each Debtor.

      2.5    Class 5 shall consist of the Allowed Unsecured Claims against each Debtor, except those held by Insiders.

      2.7    Class 6 shall consist of the Allowed Unsecured Claims of Insiders against each Debtor.

      2.8    Class 7 shall consist of the Allowed Equity Interests in each Debtor.

## ARTICLE III
## TREATMENT OF UNCLASSIFIED CLAIMS AND EXPENSES

      3.1    **Administrative Expenses.** Administrative Expenses are unimpaired under the Plan and shall be paid (i) in full on or before the Effective Date or (ii) upon such other terms as may be agreed to in writing by the holder of any Administrative Expense and the Debtors. An Administrative Expense that arose after the Petition Date in the ordinary course of business of a Debtor shall be paid by that Debtor in the ordinary course of its business pursuant to the usual and customary terms of the Claimant. The Administrative Expense incurred as a result of the motion to obtain unsecured credit, dkt. no. 418, shall be paid by that Debtor under the terms of the loan agreement and is unimpaired and not affected by the Plan or the Confirmation Order.

      3.2    **Allowed Priority Tax Claims**. Commencing on the 15th day of the first month after the Effective Date, each Debtor shall pay Allowed Priority Tax Claims in equal monthly installments over five years from the

Petition Date with interest at the rate of 12% per annum or the applicable rate under applicable to the tax, whichever is lower.

## ARTICLE IV
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The Classes of Claims are being treated as follows:

4.1     *Class 1:  Allowed Priority Claims against the Debtors.* Allowed Priority Claims against the Debtors in Class 1 shall be paid by each Debtor in 36 equal monthly installments commencing on the 15th day of the first month after the Effective Date with interest at the rate of 6% per annum or the Court-Approved Interest Rate. Provided however, that any Allowed Priority Claims paid pursuant to the Order Granting Debtors' Motion to Pay Pre-Petition Wages, dkt. no. 24 in the Case, is not impaired and shall be paid in the ordinary course of each Debtor's business, and any Allowed Priority Claim that is less than $1,000 shall be paid on the Effective Date. The Allowed Priority Claims that are subject to the Order Granting Debtors' Motion to Pay Pre-Petition Wages are not impaired. The other Allowed Priority Claims in Class 1 are impaired.

4.2     *Class 2: Allowed Claims of BMO.* The Allowed Claims of BMO shall be paid as follows:

(a)     On or prior to the Effective Date, the Debtors shall pay $200,000 to BMO, which shall be applied to the principal amount of BMO's Allowed Claims.  The Debtors may borrow $200,000 against or withdraw from the life insurance policies in which BMO has a Lien to make this payment.

(b)     At or prior to confirmation, the Debtors shall execute a note payable to BMO in the principal amount of $1,000,000 ("BMO Note 1"), which shall bear interest at the rate of 3.5% per annum with a maturity date of September 1, 2020. Commencing on the first day of the first month after the Effective Date, the Debtors shall pay interest only on BMO Note 1, one month in arrears. The entire principal and accumulated interest due and owing to BMO under BMO Note 1 shall be paid in full on September 1, 2020. Upon payment in full of BMO Note 1, and provided that the Debtors are not in default under BMO Note 2 (defined below), BMO shall release its Lien on 216-218 S. 2nd Street, Milwaukee, Wisconsin. Unless $150,000 of the Octagon Payment (defined in Section 6.12) is necessary to pay other obligations to non-insider Creditors or Claimants under the Plan, Debtors will use this $150,000 to pay towards BMO Note 1.

(c)     At or prior to confirmation, the Debtors shall execute a note for the principal amount equal to the remaining balance of BMO's Allowed Claims after deducting (i) the $200,000 payment in Section 4.2(a) above, and (ii) $1,000,000 represented by BMO Note 1, plus BMO's costs and attorney fees accrued (estimated to be $60,000), resulting in a note having an approximate principal amount of $860,000 ("BMO Note 2"; together with BMO Note 1, the "BMO Notes"), which shall bear interest at the rate of 5.5% per annum. Commencing on the first day of the first month after the Effective Date, the Debtor shall pay BMO Note 2 in full in 48 equal monthly installments of principal and interest.

(d)     BMO shall retain all Liens on all Collateral existing as of the Petition Date and afterwards as security for its Allowed Claims until they are paid, except that (1) it shall release its Liens on 216-218 S. 2nd Street, Milwaukee, Wisconsin as provided in Section 4.2(b); and (2) it shall modify its Lien on the life insurance policy referenced above, but only to the extent necessary for Debtors to borrow against or withdrawn to pay BMO the $200,000 required in 4.2(a). The Debtors may pre-pay the BMO Notes to BMO at any time without penalty. The Allowed Claims in Class 2 are impaired.

(e)     The Debtors shall execute such other loan documents as may be reasonably requested by BMO to reflect the terms stated in this Section 4.2.  In particular but without limitation, the BMO Notes shall include all customary provisions for commercial promissory notes, including provisions such as are in the existing notes evidencing the debt owed BMO by any Debtor (including without limitation a default rate of interest that adds 5% to the stated interest rate upon default but excluding covenants that due to the Debtors' filing the Cases or relate to insolvency would result in a default under the documents within one year after the Effective Date). BMO's existing security agreements, mortgages and other loan and collateral documents shall continue to evidence its first priority Liens as to pre- and post-petition collateral and govern

6

the debt evidenced by the BMO Notes, which shall be considered extensions and renewals of BMO's pre-existing notes.

4.3    ***Class 3: Allowed Claims of Liberty.*** The Allowed Claims of Liberty hall be paid and fully satisfied as follows:

(a)    The payment of $200,000 directly from the Octagon Payment as of the Effective Date;

(b)    $100,000 by the Debtors in 60 equal monthly installments of $1,667 commencing on the 15th day of the first month after the Effective Date.

(c)    The unpaid balance of the $100,000 to be paid in 60 monthly installments shall be secured by a Lien against only the proceeds of Kahler Litigation as described in Section 6.11 and no other property of the Debtors until the $100,000 is paid in full.

(d)    The Receivership Court shall have approved the Receiver's agreements in the Plan, including relieving and releasing Liberty from paying the difference between the total of the "Liberty Payments" and the "Liberty Minimum" under paragraph 4 of the Term Sheet attached to the order of the Receivership Court entered on January 17, 2018.

(e)    Except as provided in this Section 4.3, all Debtors collectively and Liberty release each other from all Claims that may exist as of or after the Petition Date and Effective Date. Additionally, Liberty releases Bruce and Carol Witt from any Claims that Liberty may have against them.

(f)    The Debtors are authorized to file an amendment to the financing statements on file on or after the Effective Date to reflect Liberty's Lien. The Debtors and Liberty shall execute a stipulation dismissing the litigation pending in the United States District Court for the Eastern District of Wisconsin, Case No. 2:18-cv-01901 with prejudice, except as to the obligations under this Plan. The Debtors and Liberty shall execute mutual and comprehensive releases of all Claims against each other, except as to the obligations under this Plan.

(g)    The Allowed Claims of Liberty are impaired.

4.4    ***Class 4: Allowed Trust Fund Claims.*** Allowed Trust Fund Claims in Classes 4 are not impaired. They retain all their rights notwithstanding the Debtors' filing voluntary petitions. They shall be paid in the ordinary course of the Debtors' businesses.

4.5    ***Class 5: Allowed Unsecured Claims.*** Allowed Unsecured Claims in Class 5 shall be paid as follows:

(a)    On a Pro Rata Basis an initial net dividend from the Octagon Payment as described in Section 6.12, in the amount of $65,000; plus

(b)    On a Pro Rata Basis until paid in full with Class 6 from 50% of the net proceeds from the Kahler Litigation as described in Section 6.11.

(c)    Allowed Claims of the Receiver and U.S. Bancorp Community Development Corporation shall be paid nothing and not share on a Pro Rata Basis with other Class 5 Allowed Claims.

4.6    ***Class 6: Allowed Unsecured Claims of Insiders.*** Allowed Unsecured Claims in Class 6 shall receive on a Pro Rata Basis with Class 5 from 50% of the net proceeds from the Kahler Litigation as described in Section 6.11.

4.7    ***Class 7: Equity Interests in the Debtors.*** The Interests in the Debtors in Class 7 are unimpaired and unaffected under the Plan. They shall retain their Interests.

4.8     ***Multiple Allowed Claims Entitled to Single Payment.*** Except as otherwise explicitly provided in the Plan, distributions to Allowed Claims, held by a Creditor against multiple Debtors based upon the same legal and factual bases, shall be considered one single Allowed Claim for purposes of distributions under the Plan in the highest amount of the proof of claim filed. Addendum 4.8 contains Claims in Class 5 that will be affected by Section 4.8.

4.9     ***Claims Not Allowed Are Not Paid.*** Any Claim that is not an Allowed Claim shall receive no distribution under the Plan.

4.10     ***Interpretation.*** The language in the Plan describing distributions to all Classes shall be interpreted to effectuate the priorities of Allowed Claims as if assets had been liquidated and payment made under the priority determined by applicable State and Federal law.

# ARTICLE V
## PROVISION FOR TREATMENT OF DISPUTED CLAIMS

5.1     ***Objection to Claims; Prosecution of Disputed Claims.*** The Debtors, the Reorganized Debtors and any other party in interest shall object to the allowance of any Claims filed with the Bankruptcy Court with respect to which any party in interest disputes liability in whole or in part. All objections shall be litigated to a Final Order; provided, however, that any party in interest may compromise and settle objections to Claims without notice and without the approval of the Bankruptcy Court. Unless otherwise allowed by the Bankruptcy Court, all parties in interest shall serve and file all objections to Claims within 45 days after the Effective Date.

5.2     ***Payments and Distributions on Disputed Claims.*** From and after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors shall hold and reserve in a segregated account, for the benefit of each holder of a Disputed Claim, Cash in an amount equal to the distribution that would have been made to the holder of any Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the amount of the Disputed Claim or (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to § 502 of the Code for purposes of allowance. Any Cash reserved and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing (a) any additional amounts to be paid in Cash in the event the Disputed Claim ultimately becomes an Allowed Claim or (b) any interest payable in accordance with the Plan by the Debtors with respect to such Disputed Claim at the time or times such cash is reserved. The segregated account for Cash reserved for the benefit of holders of Disputed Claims shall be interest-bearing. No payment or distribution shall be made with respect to all or any portion of any Disputed Claim until resolution of all disputes to the Claim by a Final Order.

At the time a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder of the Allowed Claim shall receive the payment(s) and distribution(s) to which it is then entitled under the Plan, together with any interest that has accrued on the amount of cash so reserved, but only to the extent that the interest is attributable to the amount of the Allowed Claim. Such payment(s) shall be made as soon as practicable after the date the order allowing the Claim becomes a Final Order but in no event later than 30 days after the date of the Final Order. Any cash reserved for but not necessary to pay an Allowed Claim shall be retained by the Reorganized Debtors. Disputed Claims which are disallowed shall receive nothing to the extent they are disallowed.

# ARTICLE VI
## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

6.1     ***Cash for Payments Under the Plan.*** Cash necessary to fund payments under the Plan shall be from (a) the Octagon Payment (described more fully in Section 6.12), (b) a loan against the life insurance policy that is collateral of BMO of $200,000 to be obtained as of the Effective Date shall be used solely to pay BMO under Section 4.2, (c) the regular business income of the Reorganized Debtors, (d) the sale or refinancing of the property located at 216-218 S. 2nd Street, Milwaukee, Wisconsin that is owned by KBH Holdings, LLC, shall be used solely to pay BMO under Section 4.2, and (e) the proceeds from the Kahler Litigation (described more fully in Section 6.11).

6.2     ***Management of the Reorganized Debtors.*** Existing management and Equity Interest holders shall

continue to manage the affairs of the Reorganized Debtors after the Effective Date.

6.3     ***Distributions Due on and 30 Days After the Effective Date.*** The Reorganized Debtors shall manage all distributions under the Plan for Allowed Claims and Administrative Expenses.

6.4     ***Withholding Taxes.*** The Reorganized Debtors shall withhold from distributions under the Plan all withholding taxes to the extent required by applicable law.

6.5     ***Professional Fees and Expenses.*** Each Person retained or requesting compensation in this case pursuant to §§ 327, 328, 330, 503(b) or 1103 of the Code shall be entitled to file an application for allowance of final compensation and reimbursement of expenses in the case by the date set by the Bankruptcy Court.

6.6     ***Mailing and Unclaimed Distributions.*** All distributions made by mail will be made to (a) the latest mailing address filed of record with the Bankruptcy Court for the party entitled to it, (b) if no such mailing address has so been filed, the mailing address reflected in the schedule of assets and liabilities filed by the Debtors or (c) any other address known to Debtors or the Reorganized Debtors. Any unclaimed distributions which would otherwise have been disbursed to a Creditor with respect to an Allowed Claim shall be retained as property of the Reorganized Debtors if the Creditor cannot be located.

6.7     ***Responsible Person.*** Except as otherwise may be provided herein, Harenda, on behalf of the Reorganized Debtors, shall be responsible for the execution and implementation of the Plan.

6.8     ***Debtors' Property After Confirmation.*** Except as provided in the Plan, the Reorganized Debtors shall retain possession all of their property, free and clear of all liens and encumbrances, except encumbrances of governmental authorities and utilities for easements and services.

6.9     ***Settlement of Actions or Objections.*** The Reorganized Debtors may settle or compromise any action or objection without notice or Bankruptcy Court approval.

6.10    ***Preference, Fraudulent Conveyances, Other Avoidance Actions and Other Causes of Action.*** All Claims of the Debtor against any Person, and all rights to recover preferences, fraudulent transfers or other actions that arose after the Petition Date under the Bankruptcy Code or otherwise vest on the Effective Date in the Reorganized Debtors. The actions vested in the Reorganized Debtors include any derivative action that a Creditor or Claimant may have. The Reorganized Debtors shall pursue all actions and distribute any proceeds as provided in Section 6.11.

6.11    ***Pursuit of Kahler Litigation by the Reorganized Debtors.***

(a)     ***Actions Pursued.*** As of the Petition Date, the Debtors believe that they have the following Claims against various Persons relating to the Hotel Northland Property. However, as of the Effective Date, all those Claims have been resolved by the terms of the Plan and pursuant to the Settlement Agreement, Addendum 6.12(g) with the exception of a Claim by the Debtors against Kahler Slater, Inc. for opining that KPH Construction was in default of a construction contract for the Hotel Northland Property. The Debtors are vested with, and in their sole discretion and cost, will pursue all Claims against Kahler Slater, Inc. and its insurer pursuant to the terms of this Section 6.11 (defined as the "Kahler Litigation").

(b)     ***Means of Pursuing.*** After the Effective Date, the Reorganized Debtors will pursue the Kahler Litigation in the forum that they determine is best suited for the litigation. The Reorganized Debtors shall pay the legal fees and costs associated with pursuing the Kahler Litigation.

(c)     ***Settlement Authority.*** The Reorganized Debtors have the discretion to settle the Kahler Litigation if (i) they give notice to all Creditors that may be entitled to the proceeds under Section 6.11(d) describing the proposed settlement and no objection is received within 21 days after notice is given, or (ii) the settling parties require the settlement to be confidential and the Debtors' lawyer opines that the settlement is in the best interests of the Creditors when all known factors are considered, including the likelihood of success and cost to proceed.

(d)     ***Distribution of Proceeds.*** As soon as practicable after proceeds are received from the

9

Kahler Litigation and it is reasonable to make a distribution, the proceeds shall be distributed as follows:

    (i)      The 33% or 40% if there is an appeal plus costs paid for legal fees and costs shall be paid to the Debtors paying the amounts or the lawyers pursuing the Kahler Litigation.

    (ii)     Liberty to the extent that it has a Secured Claim against the proceeds.

    (iii)    50% of the balance shall be paid on a Pro-Rata Basis to the Creditors holding the Allowed Claims in Classes 5 and 6 as provided in Sections 4.5 and 4.6 until all Allowed Claims in Classes 5 and 6 have been paid in full.

    (iv)    50% of the balance shall be paid to the Reorganized Debtors as they, in their discretion, may allocate among them.

    (v)     After 100% of the amount of Allowed Claims in Classes 5 and 6 are paid, the balance shall be retained by the Debtors as they, in their discretion, may allocate among them.

6.12    ***Octagon Payment and Receivership Court Actions.***

(a)    ***Amount.*** The Octagon Parties shall cause to be paid a total of $450,000 toward the Debtors' obligations under the Plan. The Octagon Parties shall cause to be paid $250,000 to the Debtors for payment of (1) $34,000 for Administrative Expenses; (2) Class 1 convenience Claims of under $1,000; (3) $65,000 for Class 5 Claims; and (4) $150,000 to Class 2 (BMO) (except to the extent necessary to pay other non-insider Creditors and Claimants under the Plan). The Octagon Parties shall cause to be paid $200,000 directly to Liberty to be allocated as set forth in Section 4.3. These payments are collectively defined as the "Octagon Payment."

(b)    ***Use of Octagon Payment.*** The Octagon Payment shall only be used to pay Non-Insider Allowed Claims or Administrative Expenses as provided under the Plan and shall not be paid to Insiders.

(c)    ***Conditions of Payment.*** The Octagon Parties shall not be required to make the Octagon Payment until all of the following conditions have been met: (i) the Receivership Court approves the terms under this Plan that relate to the Receiver's obligations and agreements under the Plan; (ii) the Effective Date having occurred; (iii) the Debtors having executed and delivered a release(s) of all Liens on the Hotel Northland Property and other assets that were included in the Receivership Court in a form reasonably requested by the Receiver; (iv) and Liberty having executed and delivered release(s) of all Liens on the Hotel Northland Property and other assets that were included in the Receivership Court in a form reasonably requested by the Receiver; and (v) the Receiver and the Octagon Parties have received releases of Liens on the Hotel Northland Property, including the liens of ALG Northland, LLC, in a form reasonably requested by the Receiver. The Receiver and the Octagon Parties reasonably expect that the Octagon Payment will be made within 30 days after the conditions of payment are met and court approvals have been received.

(d)    ***Good Faith in Obtaining Receivership Court Approval.*** The Debtors or Insiders of them shall not interfere with the Receiver obtaining approval from the Receivership Court of the obligations and agreements of the Receiver under the Plan and shall reasonably assist the Receiver in obtaining such approval. Additionally, upon receipt of the Octagon Payment, the Debtors and Insiders of them shall dismiss any pending proceedings, including appeals, relating to the Receivership Case.

(e)    ***Dissolving Hotel Northland Master Tenant LLC.*** The Debtors and Insiders of them over which they control will cooperate with USBCDC to wind down the business affairs and dissolve the Master Tenant.

(f)    ***Necessity of Receivership Court Approval.*** The conditions precedent in Sections 11.1 thru 11.4 occurring and the approval of the Receivership Court and Bankruptcy Court to the terms of the Plan relating to the agreements and obligations of the Receiver are conditions precedent to the Octagon Parties being required to make the Octagon Payment.

(g)    ***Settlement Agreement.*** The Bankruptcy Court shall consider the approval of the Settlement Agreement in connection with the Plan pursuant to the standards under Bankruptcy Rule 9019. Settlement Agreement, including without limitation, all consideration exchanged by parties to the Settlement Agreement and releases set forth therein is one of the primary mechanisms pursuant to which funding is available to implement and execute the Plan. The Settlement Agreement is effective upon the Effective Date.

6.13    ***Confirmation of the Plan Without Approval of Classes Entitled to Priority Over Classes 8A through 8E.*** If any Class entitled to vote rejects the Plan, the Debtors shall request that the Bankruptcy Court approve the Plan pursuant to § 1129(b)(1) of the Code.

6.14    ***Payment of U.S. Trustee Fees.*** The Reorganized Debtors shall pay all fees due after the Confirmation Date pursuant to 28 U.S.C. § 1930 until the case is closed.

6.15    ***Professional Fees.*** The Reorganized Debtors shall not pay any professional fees or costs incurred before the Confirmation Date except as approved by the Bankruptcy Court or otherwise allowed by law. The payment of any professional fees or costs after the Confirmation Date to implement the Plan shall only be made if such fees and costs are reasonable.

## ARTICLE VII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    ***Assumption and Rejection of Unexpired Leases and Executory Contracts.***

(a)    ***Assumption of Unexpired Leases and Executory Contracts.*** The Debtors assume the unexpired leases and executory contracts listed on Addendum 6.1(a) as of the Effective Date. The assumed unexpired leases and executory contracts vest in the Reorganized Debtor(s) for the Debtors that are parties to them.

(b)    ***Curage Amount.*** The amount to cure any default in the unexpired leases or executory contracts is presumed to be the amount stated on Addendum 6.1(a) as the "Curage Amount" unless a party-in-interest objects by the date on which the Court sets for objections to confirmation of the Plan. If an objection is filed, the Court shall determine the amount necessary to cure any default in order for the Debtors to assume the unexpired lease or executory contract. The Debtors shall have 15 days after the Court's determination becomes a Final Order to change their decision to assume the unexpired lease or executory contract to a rejection of it. The amount necessary to cure any default in an unexpired lease or executory contract shall be paid by the Reorganized Debtors within 30 days after the order determining the amount becomes a Final Order, or 30 days after the Effective Date if no objection is filed.

(c)    ***Rejection of Unexpired Leases and Executory Contracts.*** The Debtors reject the unexpired leases and executory contracts listed on Addendum 6.1(c) as of the Effective Date.

(d)    ***Rejection Damages.*** The amount of the Allowed Claim from the rejection of an unexpired leases or executory contracts is presumed to be the amount stated on Addendum 6.1(c) as the "Claim Amount" unless a party-in-interest files a proof of claim as provide in Section 6.2. The Debtors or Reorganized Debtors shall have 15 days after the Claim becomes an Allowed Claim to change their decision to reject the unexpired lease or executory contract to an assumption of it. In that case, the Debtors or Reorganized Debtors shall amend Addendum 6.1(a) the "Curage Amount" shall be determined as provided in Section 6.1 with the party given 21 days after the amended Addendum 6.1(a) to object to the Curage Amount.

7.2    ***Bar Date for Claims Relating to Rejected Leases or Executory Contracts.*** Unless otherwise ordered by the Bankruptcy Court, proofs of claim(s) for damages arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court no later than 30 days after the Debtors or Reorganized Debtors provide the Creditor with notice that its executory contract or unexpired lease has been rejected. **All such Claim(s) not filed within the time set forth in this section shall be forever barred and extinguished against the Debtors, their estates, and the Reorganized Debtors.** If no proof of claim is timely filed, the Creditor's Claim shall be an Allowed Unsecured Claim in the amount stated as the "Claim Amount" on Addendum 6.1(c).

7.3    ***Default Provision for Unexpired Leases and Executory Contracts Not Listed on Addendums 6.1(a) or (c).*** Any executory contracts or unexpired lease not specifically or otherwise identified on Addendums 6.1(a) or (c) are rejected.

7.4    *Termination of Master Lease.* The Receiver and Managing Member, on behalf of the Master Tenant, agree that to the extent that the Master Lease is not already terminated, it is terminated as of the Effective Date.

# ARTICLE VIII
## AMENDMENTS AND WAIVER

Except as otherwise provided in the Plan and § 1127 of the Code, any non-material term of the Plan may be amended or modified at any time, and the enforcement and observance of any term of the Plan may be waived at any time provided that all Creditors affected by the amendment or waiver have received notice of the proposed non-material amendment or waiver and have not objected in writing within a reasonable period of time and, in any event, any period of time which may be set by the Court.

# ARTICLE IX
## EFFECT OF CONFIRMATION

9.1    *Discharge of Debtors.* Except as otherwise provided in the Plan or in the Confirmation Order, the Debtors, except Harenda, will obtain a discharge as provided in § 1141 of the Code upon the Effective Date. Harenda shall receive a discharge upon completion of all payments under the Plan or otherwise as provided in § 1141(d)(5) of the Code. The discharge of the Debtors and Reorganized Debtors shall be effective as to each Claim regardless of whether a proof of claim was filed for such Claim, whether the Claim is an Allowed Claim, or whether the holder of the Claim, debt or liability has accepted the Plan. Such discharge shall not affect any liability of any non-Debtors with respect to any Claim.

9.2    *Exculpation.* None of the Plan proponents, their officers, directors, trustees, employees, advisors, professionals, or agents have or will incur any liability to any Creditor, Claimant, holder of an interest in the Debtors for any act or omission in connection with, related to, or arising out of, the Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan, except for willful misconduct, and in all respects the proponents, creditors, officers, directors, trustees, employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

9.3    *Injunction.* Except as otherwise provided for in the Plan, including as may be provided for in the loan documents to be entered into with BMO by the Reorganized Debtors under Section 4.2(e), all Persons who have held, hold, or may hold Claims as of the Effective Date are permanently enjoined from and after the Effective Date from:

(a)    commencing and continuing in any manner any action or other proceeding of any kind with respect to any Claim against the Reorganized Debtors, or any of his agents, employees, representatives, financial advisors, attorneys, accountants or affiliates of any such parties (collectively, the "Related Entities"), but solely in the Related Entities' representative capacities as agents or employees of the Reorganized Debtors;

(b)    enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Reorganized Debtors or any Related Entities, but solely in the Related Entities' representative capacities as agents or employees of the Reorganized Debtors, or the property of such parties with respect to such Claim;

(c)    creating, perfecting, or enforcing any encumbrance of any kind against the Reorganized Debtors or any Related Entities, but solely in the Related Entities' representative capacities as agents or employees of the Reorganized Debtors, or against the property of any such party or property of the Debtors and the Reorganized Debtors, with respect to any such Claim; and

(d)    asserting any right of set-off, right of subrogation, or recoupment of any kind against any obligation due the Reorganized Debtors or any Related Entities, but solely in the Related Entities' representative

12

capacities as agents, employees, representatives, financial advisors, attorneys, accountants, or any affiliates of any such parties, or against the property of any such parties of the property of their affiliates, with respect to such Claim.

(e)        Notwithstanding Section 9.3(a) through (d), upon a default under the Plan, Creditors holding Allowed Priority Tax Claims may take collection action, including enforcement of the Plan, and administrative collection action or other action authorized by applicable non-bankruptcy laws.

9.4      ***Settlement Agreement***.  The Plan incorporates and implements the Settlement Agreement which reflects a compromise and settlement of certain claims and causes of action (as set forth in greater detail therein).  The releases contained in the Settlement Agreement and incorporated into the Plan reflect a critical component of the Settlement Agreement, without which the parties thereto would not have agreed to support the Plan.  Accordingly, the Plan is also being proposed pursuant to Bankruptcy Rule 9019.  As of the Effective Date, the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Settlement Agreement and the Bankruptcy Court's finding that the Settlement Agreement is in the best interests of the Debtor, the Reorganized Debtor, holders of Claims and holders of interests in the Debtor and Reorganized Debtor and is fair, equitable and reasonable.

9.5      ***Consummation.***  Upon substantial consummation of the Plan, the Reorganized Debtors may move for a final decree closing the Case and requesting such orders as may be just and equitable.

# ARTICLE X
# RETENTION OF JURISDICTION

The Court may retain jurisdiction over this Case, until the Plan has been fully consummated, for all appropriate purposes including, but not limited to, the following:

10.1      To hear and determine all applications for compensation of professionals under § 330 of the Code.

10.2      To classify or reclassify the Claim of any Creditor, and to resolve any and all objections filed against any Claim. Any failure of the Debtors to object to or to examine any Claim for purposes of voting shall not be deemed a waiver of the Debtors' or Reorganized Debtors' right to object to or to re-examine any Claim in whole or in part.

10.3      To determine all questions and disputes arising under the Plan and Settlement Agreement, including those regarding title to or interests in the Reorganized Debtors' assets as well as the resolution of all Claims, causes of action, controversies, disputes or conflicts, including any preference, fraudulent conveyance or avoidance action pending as of the Confirmation Date, and for which jurisdiction is specifically retained in the Plan.

10.4      To correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order necessary to carry out the purposes and intent of the Plan.

10.5      To modify the Plan after confirmation.

10.6      To enforce and interpret the terms and conditions of the Plan and Settlement Agreement, and to enforce all of the orders entered by the Court.

10.7      To enter any order, including orders for injunctive relief, necessary to enforce the title, rights and powers of the Debtors or Reorganized Debtors, as well as the imposition of such restrictions, limitations, terms and conditions as the Court may deem necessary.

10.8      To supervise or approve any aspect of any Claim that might be pursued on behalf of the Debtors, Reorganized Debtors or any Creditor.

10.9      To resolve all adversary actions brought in the Cases.

10.10     To enter any order concluding and terminating the Cases.

**ARTICLE XI**
**CONDITIONS PRECEDENT TO EFFECTIVENESS**

Effective Date of the Plan shall occur when each of the following conditions 11.1 through 11.5 have been met (Section 11.2 is considered met if it has been waived in writing by the Debtors and such writing has been filed with the Bankruptcy Court, and Section 11.4 is considered met if it has been waived by all parties to the Settlement Agreement and such writing has been filed with the Bankruptcy Court):

11.1    The Confirmation Order shall have been entered by the Court without any stay.

11.2    There has not been an appeal of the Confirmation Order filed.

11.3    [Intentionally left blank.]

11.4    All conditions precedent to effective date of the Settlement Agreement have been satisfied, including, (a) the Receivership Court approving the terms of the Settlement Agreement and the Plan that relate to the Receiver's obligations under them; (b) the Plan is confirmed, and any modifications to the Plan are approved by the parties to the Settlement Agreement; (c) the Receiver and the Octagon Parties have received release(s) of all Liens on the Hotel Northland Property, including the Liens of the Debtors, Liberty Mutual and ALG Northland, LLC, and other assets that were included or administered in the Receivership in a form reasonably requested by the Receiver.

11.5    The Octagon Payment shall be received by the Debtors and Liberty, respectively, as set forth in Section 6.12.


**ARTICLE XII**
**MISCELLANEOUS**

12.1    The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the text of the Plan.

12.2    The rules of construction used in § 102 of Code shall apply to the construction of the Plan.

12.3    The Articles of Incorporation or bylaws of the Reorganized Debtors are hereby amended to include a provision prohibiting the issuance of nonvoting equity securities.

12.4    All fees under 28 U.S.C. § 1930, due to the U.S. Trustee, that have not been paid shall be paid within 10 days of the Confirmation Date.

12.5    The liens of all Creditors that have been discharged or avoided shall be released of record prior to any cash distribution or delivery of any property under the Plan to such Creditors.

12.6    The liens of every Creditor with a Claim that is disallowed or whose lien is avoided shall be void and shall be rendered void by the recording in the appropriate place of record of a certified copy of any order disallowing the Claim or avoiding the lien.

12.7    Any orders entered or agreements approved by the Bankruptcy Court for the use of cash collateral, for adequate protection or for payments in lieu of the lifting of the automatic stay shall be terminated upon entry of the Confirmation Order.  At that time, the relationship between the respective parties shall be governed by the Plan.

12.8    Unless otherwise provided for in the Plan, no holder of an Allowed Unsecured Claim shall be entitled to the accrual of post-petition interest on account of such Claim.

12.9    Any documents necessary to effect the provisions of the Plan will be filed with the Bankruptcy Court before the hearing on confirmation of the Plan.

14

12.10    The attorneys' fees and costs to administer consummation of the Plan shall be reasonable.

## CONCLUSION

The Plan reflects the Debtors' best efforts to reorganize their business in a manner that preserves their continued viability, advances the interests of creditors, and complies in all aspects with the requirements of the Code.

Dated:  February 5, 2020
          as modified on March 4, 2020,
          March 20, 2020, April 3, 2020,
          May 6, 2020 and May 13, 2020.

<table>
<tr><td>/s/ Jerome R. Kerkman</td><td>/s/ Rebecca R. DeMarb</td></tr>
<tr><td>Jerome R. Kerkman</td><td>Rebecca R. DeMarb</td></tr>
<tr><td>Kerkman & Dunn</td><td>DeMarb Brophy LLC</td></tr>
<tr><td></td><td></td></tr>
<tr><td>Attorneys for<br>KPH Construction, Corp., KPH<br>Environmental, Corp., and KPH<br>Construction Services, LLC</td><td>Attorneys for Keith P. Harenda<br>and Triple H. Holdings, LLC</td></tr>
</table>

P.O. Addresses:

| | |
|---|---|
| 839 N. Jefferson St., Suite 400 | P.O. Box 631 |
| Milwaukee, Wisconsin 53202-3744 | Madison, Wisconsin 53701 |
| Phone: 414.277.8200 | Phone: 608.310.5500 |
| Facsimile: 414.277.0100 | Facsimile: 608.310.5525 |
| Email: jkerkman@kerkmandunn.com | Email: rdemarb@demarb-brophy.com |

15

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (**"Settlement Agreement"**) is made this 15th day of May, 2020, by and between the Debtors, the Receiver, Hotel Northland, the Octagon Parties, Liberty, USBCDC and the Harenda Related Entities (collectively, the **"Parties"** and each separately as a **"Party"**), described and defined in more particular below:

| Chapter 11 Debtor Parties | | | |
|---|---|---|---|
| **Legal Name** | **Position in the Bankruptcies** | **Position in the Receivership** | **Short Form** |
| KPH Construction, Corp. | Debtor | Creditor | **"KPH Construction"** |
| KPH Environmental Corp. | Debtor | Creditor | **"KPH Environmental"** |
| KPH Construction Services, LLC | Debtor | Creditor | **"KPH Services"** |
| Triple H Holdings, LLC | Debtor | Creditor | **"Triple H"** |
| Keith P. Harenda | Debtor | Creditor | **"Harenda"** |
| KPH Construction, KPH Environmental, KPH Services, Triple H, and Harenda, are collectively referred to as the **"Debtors."** | | | |

**and**

| Receiver Parties | | | |
|---|---|---|---|
| **Legal Name** | **Position in the Bankruptcies** | **Position in the Receivership** | **Short Form** |
| Paul Swanson, as Chapter 128 Receiver for Hotel Northland, LLC | Creditor | Chapter 128 Receiver | **"Receiver"** |
| Hotel Northland, LLC | Creditor | Assignor | **"Hotel Northland"** |

**and**

| Octagon Parties | | | |
|---|---|---|---|
| **Legal Name** | **Position in the Bankruptcies** | **Position in the Receivership** | **Short Form** |
| Octagon Credit Partners, LP | N/A | Creditor | **"Octagon Credit"** |
| Octagon Finance, LLC | N/A | Creditor | **"Octagon Finance"** |
| 304 North Adams Green Bay, LLC | N/A | Creditor | **"304 GB"** |
| 304 North Adams Master Tenant, LLC | N/A | Creditor | **"304 MT"** |
| Octagon Credit, Octagon Finance, 304 GB, and 304 MT are collectively referred to as the **"Octagon Parties"**. | | | |

**and**

| Liberty Mutual | | | |
|---|---|---|---|
| **Legal Name** | **Position in the Bankruptcies** | **Position in the Receivership** | **Short Form** |
| Liberty Mutual Insurance Company | Creditor | Creditor | **"Liberty"** |

**and**

| USBCDC | | | |
|---|---|---|---|
| **Legal Name** | **Position in the Bankruptcies** | **Position in the Receivership** | **Short Form** |
| U.S. Bancorp Community Development Corporation | Creditor | N/A | **"USBCDC"** |

**and**

| Harenda Related Entities | | | |
|---|---|---|---|
| **Legal Name** | **Position in the Bankruptcies** | **Position in the Receivership** | **Short Form** |
| Hotel Northland Developer, LLC | N/A | N/A | **"HN Developer"** |
| Hotel Northland Master Tenant Managing Member, LLC | N/A | N/A | **"Managing Member"** |
| Hotel Northland Special Member, LLC | N/A | N/A | **"Special Member"** |
| Hotel Northland Master Landlord Managing Member, LLC | N/A | N/A | **"Landlord Managing Member"** |
| KPH Northland Hotel, LLC | N/A | N/A | **"KPH Northland"** |
| HN Developer, Managing Member, Special Member, Landlord Managing Member and KPH Northland are collectively referred to as the **"Harenda Related Entities"**. | | | |

## RECITALS

**WHEREAS,** on April 9, 2015, Hotel Northland, as owner, and KPH Construction, as contractor, entered into a construction contract, inclusive of all amendments, (the **"Construction Contract"**) for the construction of the Hotel Northland (the **"Hotel Northland Project"**) located at 304 North Adams Street, Green Bay, Wisconsin;

**WHEREAS,** Liberty Mutual is the surety on: (i) Payment Bond No. 354-033-761 (the **"Payment Bond"**) naming KPH Construction as principal in connection with the Construction Contract; (ii) Performance Bond No. 354-033-761 naming KPH

Construction as principal in connection with the Construction Contract (the **"Performance Bond"**), and (iii) Discharge of Mechanic's Lien Bond No. 354-035-473 (**"Discharge Bond"**) (collectively, the **"Liberty Bonds"**);

**WHEREAS,** the Chapter 11 Debtor Parties are joint and several indemnitors to Liberty under certain General Agreements of Indemnity;

**WHEREAS,** on August 23, 2017, Octagon Credit, through its general partner, Octagon Finance, initiated an action under Chapter 128 of the Wisconsin Statutes which sought a receiver to be appointed over the assets of Hotel Northland pursuant to Wis. Stat §128.08, captioned *In re Hotel Northland LLC*, Brown County Case No. 17-CV-1133 (the **"Receivership Case"**);

**WHEREAS,** on October 9, 2017, Paul G. Swanson, was appointed Chapter 128 Receiver of Hotel Northland by order of the Brown County Circuit Court (the "Receivership Court") in the Receivership Case;

**WHEREAS,** by letter dated October 23, 2017, the Receiver notified KPH Construction that the Receiver was terminating the Construction Contract for the stated grounds that (a) KPH Construction failed to make payment to certain of its subcontractors for materials or labor in accordance with the respective subcontractor agreements, and (b) KPH Construction failed to maintain certain insurance coverages in accordance with the Construction Contract (the **"Termination Letter"**).

**WHEREAS,** the Debtors have disputed the Receiver's grounds for termination as stated in the Termination Letter, have asserted that the termination of the Construction Contract was wrongful under applicable law, and that the Termination Letter had no legal effect on the rights of the Master Tenant (as defined below) in the hotel property owned by Hotel Northland under the master lease;

**WHEREAS,** on December 7, 2017, the Receivership Court entered an Order that granted the Receiver and Octagon Credit's Joint Motion for Allowance of Protective Advances (**"Protective Advances Order"**);

**WHEREAS,** on January 17, 2018, the Receivership Court entered an Order that granted the Receiver's Motion to Incur Secured Debt to Complete Construction and Grant a Super-Priority Mortgage to Lender (**"Super-Priority Order"**) and, by way of that same Order, further approved, adopted, and ratified a Term Sheet entered into between the Receiver, Octagon Credit and its general partner, Octagon Finance, on the one hand, and Liberty, on the other hand (**"Term Sheet"**);

**WHEREAS,** over the course of the Receivership Case, KPH Construction has filed several Petitions for Leave to Appeal Non-Final Orders entered in the Receivership, two of which were denied (2017AP2476-LV and 2018AP1036-LV), and one of which (2019AP143-LV) has been in abeyance by District III of the Wisconsin Court of Appeals (the **"Petitions for Leave"**);

**WHEREAS,** on December 3, 2018, Liberty filed an action against the Debtors and other indemnitors, including Bruce and Carol Witt, for recovery of its losses occasioned by the Liberty Bonds in the United States District Court for the Eastern District of Wisconsin, case no. 18-CV-1901 (the **"Indemnity Lawsuit"**);

**WHEREAS,** on February 6, 2019, the Debtors filed their chapter 11 Cases which the Bankruptcy Court ordered to be jointly administered;

**WHEREAS**, on April 15, 2019, USBCDC filed a proof of claim No. 8-1 in Harenda, case no. 19-20944-beh, in the amount of $587,345.70 (the "**USBCDC Claim**");

**WHEREAS,** on November 15, 2019, the Debtors filed a Joint Plan of Reorganization and Disclosure Statement that was unacceptable to some of the Debtors' creditors;

**WHEREAS,** on January 7, 2020, USBCDC filed an objection to the Disclosure Statement and asserted, among other things, that the Joint Plan of Reorganization improperly proposes to distribute to creditors certain property, including, but not limited to, historic tax credits associated with the Hotel Northland Project (**"Historic Tax Credits"**), that belong to a non-debtor entity, Hotel Northland Master Tenant, LLC (**"Master Tenant"**);

**WHEREAS**, USBCDC asserts that it owns 99% of the membership interests in the Master Tenant and Hotel Northland Master Tenant Managing Member LLC ("**Managing Member**"), an entity controlled by Keith Harenda, owns 1% of the membership interests in the Master Tenant and is the managing member, and the Debtors dispute that USBCDC has any interest in the Master Tenant as of the Petition Date;

**WHEREAS,** on January 14, 2020, the Debtors, the Receiver, Liberty and BMO Harris ("**BMO**") participated in a court-ordered mediation to discuss a resolution of the various competing claims between those parties, which from time to time involved additional discussions and negotiations with certain of the Octagon Parties and USBCDC;

**WHEREAS,** on January 14, 2020, the Debtor, the Receiver, Liberty, and BMO reached an agreement in principal and memorialized that agreement in the Term Sheet (the "Mediation Term Sheet"); and

**WHEREAS,** certain aspects of the agreements and concessions reached at the mediation as reflected in the Mediation Term Sheet are expressed in this Settlement Agreement and the Plan where appropriate.

**NOW, THEREFORE,** in consideration of the foregoing and in consideration of the mutual covenants and promises hereinafter set forth, and for other good and valuable

Plan Addendum Page 19

4

consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT AND RELEASES

Section 1.  [Intentionally left blank.]

Section 2.  <u>Relationship with Plan</u>. This Settlement Agreement is incorporated into the Plan. Definitions in the Plan have the same meanings in this Settlement Agreement.

Section 3.  <u>Effective Date</u>. This Settlement Agreement is binding on all parties on the Effective Date, as defined in the Plan proposed by the Debtors on February 5, 2020. If the Effective Date does not occur before June 12, 2020, then this Settlement Agreement shall be void *ab initio* and the parties restored to their positions in existence immediately before its execution. In the event the Plan is modified, amended or changed prior to the Effective Date, the Debtors shall obtain consent from the Parties to this Settlement Agreement for these changes, such consent not to be unreasonably withheld.

Section 4.  <u>Conflict</u>.  The provisions of this Settlement Agreement control any conflict with the Plan, the Disclosure Statement, and the Confirmation Order. All discussions between the Parties and the Mediation Term Sheet are merged into and integrated into this Settlement Agreement. It is the final expression of the parties' agreement and all previous agreements, including the Mediation Term Sheet have no effect.

Section 5.  <u>Duty to Cooperate</u>.

Section 5a.  <u>Closure of Receivership Case</u>.

The Debtors and Insiders shall not interfere with the Receiver obtaining approval from the Receivership Court, and shall reasonably assist the Receiver in obtaining approval, of (i) the obligations and agreements of the Receiver under the Plan; (ii) the terms and conditions of this Settlement Agreement, (iii) the winding down and closing of the Receivership Case in a timely fashion, (iv) an Order discharging the Receiver, and (v) all other steps reasonably necessary to bring the Receivership Case to a timely, complete, and final resolution.

Section 5b.  <u>Litigation Relating to the Liberty Bonds</u>.

The Debtors and Insiders agree to cooperate with Liberty in the defense of the any current lawsuits pending, but that are stayed, relating to the Liberty Bonds. "Cooperation" includes providing any information and assistance as may be reasonably requested by Liberty, and providing truthful testimony by way of affidavits, depositions or trial testimony as deemed necessary by Liberty.

Section 5c.  <u>Dissolution of Master Tenant/Termination of Master Lease</u>.

Harenda and the Managing Member represent and warrant to USBCDC that the Master Tenant does not have any debts, liabilities or other obligations to third

parties. The Debtors or Insiders agree to cooperate with USBCDC to wind down the business affairs and dissolve the Master Tenant. The Receiver and Managing Member on behalf of the Master Tenant agree that, to the extent that certain lease by and between Hotel Northland LLC and Master Tenant (the "Master Lease") is not already terminated, then it is terminated as of the Effective Date.

Section 5d. Receiver and Liberty.

To the extent necessary, the Receiver agrees to cooperate with Liberty to obtain any additional releases from the subcontractor/claimants in the Receivership Case that have been paid in full by the Receiver as identified in paragraph 6 of the Term Sheet attached to the Super-Priority Order, but who have not provided full and final releases of Liberty.

Section 6. No Appeal(s).

The Debtors and Insiders agree to dismiss all Petitions for Leave and Notice(s) of Appeal that are pending with the Wisconsin Court of Appeals, including all stayed appeals, and further agree not to file any additional Notice(s) of Appeal and/or appeal any decision, order, judgment or other determination made by the Receivership Court, and hereby waive any and all appeal rights they may have under the law, including, but not limited to, Wis. Stat. § 809.03 and Chapter 128 of the Wisconsin Statutes.

Section 7. Covenant Not to Sue. Preferences or Similar Law.

In consideration of the covenants and promises contained herein, the Receiver and the Debtors and the Reorganized Debtors shall not file any lawsuit or initiate any other action or proceeding, or seek relief in any court or other forum, to claw-back or seek the return of payments made under the preference provisions of the Bankruptcy Code or Chapter 128, Wis. Stats., or similar avoidance and/or fraudulent conveyance law, from any individual or entity that furnished labor, materials, or equipment in performance of the Construction Contract or in connection with the Hotel Northland Project, the return of such funds or payments that could result in or trigger a claim against Liberty or the Liberty Bonds or could result in or trigger liability under the Liberty Bonds. The Reorganized Debtors represent and warrant that no other Insider has the ability to bring any such proceeding or action as described in this Section 7, all such rights being invested in the Reorganized Debtors.

Section 8. Payment by the Octagon Parties.

Section 8a. Payment to the Reorganized Debtors.

Subject to the other provisions in the section 8, the Octagon Parties shall cause to be paid to, or for the benefit of, the Reorganized Debtors $250,000.00.

Section 8b.  Payment to Liberty.

The Octagon Parties shall directly pay to Liberty, as it directs, $200,000.00.

Section 8c.  Conditions Precedent / Timing.

The Octagon Parties shall not be required to make the payments referenced in Sections 8a. and 8b. above, until all of the following conditions have been met: (i) the Receivership Court approves the terms under this Settlement Agreement and the Plan that relate to the Receiver's obligations under them; (ii) the satisfaction of the conditions precedent in Sections 11.1 through 11.4 of the Plan; (iii) the Plan is confirmed; and (iv) the Receiver and the Octagon Parties having received release(s) of all liens on the Hotel Northland Project, including the liens of Debtors, Liberty and ALG Northland, LLC, and other assets that were included or administered in the Receivership in a form reasonably requested by the Receiver.  The payments shall be made upon the satisfaction of conditions precedent and at the times all as set forth in the Plan.

Section 9.  Liberty's Relief Under Super-Priority Order and Term Sheet.

As part and parcel of the Receiver seeking approval from the Receivership Court of this Settlement Agreement and the Plan, the Receiver also agrees to seek and obtain relief from the Receivership Court to relieve, release, and forever acquit Liberty from its obligations (i) to pay an additional amounts under the Payment Bond, and (ii) to pay the difference between the "Liberty Payments" and the "Liberty Minimum" as those terms are defined in paragraph 4 of the Term Sheet attached to the Super-Priority Order.  The Receiver also agrees to not challenge any payments made by Liberty under the Super-Priority Order and attached Term Sheet.

Section 10.  Withdrawal of Proofs of Claim Filed in Receivership Case / Lien Removal.

Upon full execution of this Settlement Agreement, the Debtors, Liberty, Insiders and USBCDC agree to execute various lien releases and withdrawals of Proof(s) of Claim in the Receivership Court, as more particularly set forth below, and provide these documents to the Receiver to be held in trust pending the occurrence of the Effective Date. Upon the occurrence of the Effective Date, the Receiver shall cause the documents to be filed in the Receivership Case and/or with the Brown County Register of Deeds.

Section 10a.  The Chapter 11 Debtor Parties.

The Debtors agree to (i) withdraw the respective Proofs of Claim filed by each of them in the Receivership Case, and (ii) remove, withdraw, dismiss, and

Plan Addendum Page 22

7

release any and all liens that each of them may have filed, claim to have, or claimed to have, with respect to the assets being administered, or that have been administered in the Receivership Case, including, but not limited to the real property constituting the Hotel Northland Project and any rights in the historic tax credits.

Section 10b. <u>Liberty</u>.

Liberty agrees to (i) withdraw its Proof of Claim filed in the Receivership Case, and (ii) remove, withdraw, dismiss, and release any and all liens that Liberty claims to have, or claimed to have, with respect to the assets being administered, or that have been administered in the Receivership Case, including, but not limited to the real property constituting the Hotel Northland Project. This includes releasing any priority lien recognized or created by paragraph 5 of the Term Sheet attached to the Super-Priority Order.

Section 10c. <u>Related Entities to the Chapter 11 Debtor Parties and their Constituents.</u>

There are several entities related to the Chapter 11 Debtor Parties by common ownership or by their involvement in the Hotel Northland Project, including, but not limited to, Master Tenant, Hotel Northland Developer, LLC, Hotel Northland Master Tenant Managing Member, LLC, Hotel Northland Special Member LLC, Hotel Northland Master Landlord Managing Member, LLC, and KPH Northland Hotel, LLC (collectively, the **"Harenda Related Entities"**). The Debtors agree to cause the Harenda Related Entities to (i) withdraw in the Receivership Case any Proof(s) of Claim filed by them or any other entity they have control or an ownership interest in, (ii) waive and release any and all rights to file Proof(s) of Claim in the Receivership Case; and (iii) remove, withdraw, dismiss, and release any and all liens and rights, if any, that they or any entity in which any of them have control or an ownership interest in may have filed, claim to have, or claimed to have, with respect to the assets being administered, or that have been administered in the Receivership Case, including, but not limited to the real property constituting the Hotel Northland Project and any rights to the historic tax credits.

Section 10d. <u>USBCDC</u>.

USBCDC agrees (i) it shall receive no distribution on the USBCDC Claim under the Plan, and (ii) it shall remove, withdraw, dismiss, and release any and all liens that USBCDC may have filed, claim to have, or claimed to have, with respect to the assets being administered, or that have been administered in the Receivership Case, including, but not limited to the real property constituting the Hotel Northland Project.

Section 11.  <u>Releases</u>.

       Section 11a.  <u>Releases Between the Octagon Parties and the Debtor</u>.

       In exchange for the Payments set forth in Section 8  above, and the mutual releases set forth herein, and as set forth in the Plan, the Debtors and Insiders, along with the Harenda Related Entities, hereby completely, unconditionally, and forever release, acquit and discharge the Octagon Parties and their past and present parent entities, subsidiary entities, and other affiliated entities (the term "affiliated entities" includes, but is not limited to, any entity controlling, controlled by, or under common control with any of the Octagon Parties), and all of their respective servants, predecessors, successors, assigns, heirs, beneficiaries, officers, representatives, limited partners, general partners, directors, shareholders, employees, managers, members, principals, attorneys, insurers, and agents, and all other persons, entities, or associations in privity with the foregoing with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Debtors, Insiders, along with the Harenda Related Entities, ever had, now have, or in the future may have, whether known or unknown, arising from or relating to the Construction Contract, the Hotel Northland Project, the Termination Letter, the Receivership Case, the Protective Advances Order, the Super-Priority Order (including the Term Sheet), and any and all other claims and causes of action referenced at any time by the Debtors as potential litigation claims against the Octagon Parties  involving the Hotel Northland Project.

       In exchange for the obligations of the Debtors set forth in sections 4, 5, 6 and 10, above, and based upon the mutual releases set forth herein, the Octagon Parties hereby completely, unconditionally, and forever release, acquit and discharge the Debtors, Insiders, the Harenda Related Entities, and all of their respective servants, predecessors, successors, assigns, heirs, beneficiaries, officers, representatives, limited partners, directors, shareholders, employees, managers, members, principals, attorneys, insurers, and agents, and all other persons, entities, or associations in privity with the foregoing with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Octagon Parties ever had, now have, or in the future may have, whether known or unknown, arising from or relating to the Construction Contract, the Hotel Northland Project, the Termination Letter, the Receivership Case, the Protective Advances Order, and the Super-Priority Order (including the Term Sheet).

       Section 11b.  <u>Releases between the Receiver and the Debtors</u>.

       In exchange for the mutual releases set forth herein, and the Receiver's affirmative vote for the Plan, the Debtors, Insiders and the Harenda Related Entities hereby completely, unconditionally, and forever release, acquit and

discharge the Receiver and the Estate in the Receivership Case with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Debtors, Insiders and the Harenda Related Entities, ever had, now have, or in the future may have, whether known or unknown, arising from or relating to the Construction Contract, the Hotel Northland Project, the Termination Letter, the Receivership Case, the Protective Advances Order, and the Super-Priority Order (including the Term Sheet).

In exchange for the obligations of the Debtors set forth in sections 4, 5, 6 and 10, above, and the mutual releases contained herein, the Receiver hereby completely, unconditionally, and forever releases, acquits and discharges the Debtors with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Receiver ever had, now has, or in the future may have, whether known or unknown, arising from or relating to the Construction Contract, the Hotel Northland Project, the Termination Letter, the Receivership Case, the Protective Advances Order, and the Super-Priority Order (including the Term Sheet).

Section 11c.  Releases between Liberty and the Debtors.

In exchange for the releases provided for herein, the Debtors, Insiders and the Harenda Related Entities hereby completely, unconditionally, and forever release, acquit and discharge Liberty and its past and present parent entities, subsidiary entities, and other affiliated entities (the term "affiliated entities" includes, but is not limited to, any entity controlling, controlled by, or under common control with Liberty), and all of their servants, predecessors, successors, assigns, heirs, beneficiaries, officers, representatives, directors, shareholders, employees, managers, members, principals, attorneys, insurers, and agents, and all other persons, entities, or associations in privity with the foregoing with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Debtors, Insiders and the Harenda Related Entities, ever had, now have, or in the future may have, whether known or unknown, including any claims for bad faith, arising from or relating to the Construction Contract, the Hotel Northland Project, the Liberty Bonds, the Receivership Case, the Protective Advances Order, the Super-Priority Order (including the Term Sheet), and the Indemnity Lawsuit.

In exchange for the obligations of the Debtors set forth in sections 4, 5, 6 and 7, the releases being provided herein, and the payment set forth in Section 8 above, except for those obligations of the Debtors as stated in the Plan, including, the $100,000 claim of Liberty, Liberty hereby completely, unconditionally, and forever releases, acquits and discharges the Debtors, and Bruce and Carol Witt with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages Liberty ever had, now have, or in the future may have, whether known or unknown, arising from or relating to the Construction Contract, the Hotel Northland Project, the Termination Letter, the

Receivership Case, the Protective Advances Order, the Super-Priority Order (including the Term Sheet), and the Indemnity Lawsuit.

After Liberty's receipt of payment by the Octagon Parties as contemplated by Section 8b. above, Liberty agrees to file a Notice of Dismissal in the Indemnity Lawsuit dismissing the Indemnity Lawsuit.

Section 11d. [Intentionally left blank.]

Section 11e. <u>Releases between the Octagon Parties and Liberty</u>.

Pursuant to the Super-Priority Order and paragraph 7 of the Term Sheet, the Octagon Parties shall provide full and final releases to Liberty, in a form acceptable to Liberty. Consistent with that paragraph 7, the Octagon Parties hereby completely, unconditionally, and forever release, acquit and discharge Liberty and their past and present parent entities, subsidiary entities, and other affiliated entities (the term "affiliated entities" includes, but is not limited to, any entity controlling, controlled by, or under common control with Liberty), and all of their respective servants, predecessors, successors, assigns, heirs, beneficiaries, officers, representatives, limited partners, directors, shareholders, employees, managers, members, principals, attorneys, insurers, and agents, and all other persons, entities, or associations in privity with the foregoing with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Octagon Parties ever had, now have, or in the future may have, whether known or unknown, arising from or relating to the Hotel Northland Project, the Liberty Bonds, and the Receivership Case.

In exchange for the payment set forth in section 8b above, and the mutual releases contained herein, and pursuant to the terms of the  Plan, except for those rights conferred on  Liberty by the Super-Priority Order and the Term Sheet and the obligations of the Octagon Parties thereunder, Liberty hereby completely, unconditionally, and forever releases, acquits and discharges the Octagon Parties and their past and present parent entities, subsidiary entities, and other affiliated entities (the term "affiliated entities" includes, but is not limited to, any entity controlling, controlled by, or under common control with any of the Octagon Parties), and all of their respective servants, predecessors, successors, assigns, heirs, beneficiaries, officers, representatives, limited partners, general partners, directors, shareholders, employees, managers, members, principals, attorneys, insurers, and agents, and all other persons, entities, or associations in privity with the foregoing with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages Liberty ever had, now have, or in the future may have, whether known or unknown, arising from or relating to the Hotel Northland Project and the Receivership Case.

Section 11f. <u>Releases between the Receiver and Liberty</u>.

Pursuant to the Super-Priority Order and paragraph 7 of the Term Sheet, the Receiver shall provide full and final releases to Liberty, in a form acceptable to Liberty. Consistent with that paragraph 7, the Receiver hereby completely, unconditionally, and forever releases, acquits and discharges Liberty with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages the Receiver ever had, now has, or in the future may have, whether known or unknown, arising from or relating to the Hotel Northland Project, the Liberty Bonds, and the Receivership Case.

In exchange for the payment set forth in Section 8b, above, and the mutual releases contained herein, except for those rights conferred on Liberty by the Super-Priority Order and the Term Sheet and the obligations of the Receiver thereunder, Liberty hereby completely, unconditionally, and forever releases, acquits and discharges the Receiver with respect to any and all actions, causes of action, claims, counterclaims, debts, demands, liabilities, losses and damages Liberty ever had, now has, or in the future may have, whether known or unknown, arising from or relating to the Hotel Northland Project and the Receivership Case.

Section 11g. <u>Releases Among USBCDC, the other Parties and Managing Member</u>.

(i) <u>Release by Parties (other than USBCDC) (hereafter, the "Other Parties") and Managing Member</u>. On the Effective Date, in exchange for USBCDC's agreement to accept zero distribution on the USBCDC Claim and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Other Parties and Managing Member, for and on behalf of all of the Other Parties' and Managing Member's officers, directors, shareholders, partners, affiliates, subsidiaries, related entities, employees, agents, servants, representatives, attorneys, successors in interest and assigns (the "**Other Party Release Parties**"), hereby release, acquit and forever discharge USBCDC, the Master Tenant, and each and every past and present owner, officer, director, shareholder, affiliate, subsidiary, related entity, employee, agent, servant, representative, heir, attorney, successor in interest and assign of USBCDC and/or Master Tenant (the "**USBCDC Release Parties**"), from any and all claims, claims for relief, actions, causes of actions, suits, debts, liens, contracts, obligations, agreements, promises, representations, liabilities, demands, damages, losses, costs, and expenses of every kind or nature, whether known or unknown, joint or several, fixed or contingent, arising out of or related to the Receivership, the Cases, and the Hotel Northland Project, the Liberty Bonds, including, without limitation, the Historic Tax Credits and the Master Lease, which the Other Party Release Parties may have had, may now have, may claim to have, or may hereafter have or claim to have against the USBCDC

Release Parties or any of the other persons and/or parties hereby released at any time in the past down to the Effective Date (the "**Other Party Releases**");

      (ii)    <u>Release by USBCDC of Release Parties</u>. On the Effective Date, in exchange for the Other Party Releases, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the USBCDC Release Parties, acquit and discharge the Other Party Release Parties, from any and all claims, claims for relief, actions, causes of actions, suits, debts, liens, contracts, obligations, agreements, promises, representations, liabilities, demands, damages, losses, costs, and of every kind or nature, whether known or unknown, joint or several, fixed or contingent, arising out of or related to the Receivership, the Cases, and the Hotel Northland Project, including, without limitation, the Historic Tax Credits and the Master Lease, that USBCDC Released Parties may have had, may now have, may claim to have, or may hereafter have or claim to have against the Other Party Release Parties or any of the other entities and persons hereby released at any time in the past down to the Effective Date (the "**USBCDC Release**").

Section 12.   <u>Effectiveness and Inter-relatedness. Good Faith. Time is of the Essence.</u>

Based on the number of parties to this Settlement Agreement and the various inter-related obligations and promises between the Parties as stated herein and in the Plan, the sequencing of certain obligations and responsibilities set forth herein will necessarily occur prior to other obligations and responsibilities by a counter-party, while others will necessarily be sequenced after. In order to effectuate the intent of the Parties herein, the Parties agree to work together in good faith, with due care, and in a timely fashion (as time is of the essence) to accomplish the steps necessary to reach a resolution as contemplated herein. All of the releases set forth above in section 11 shall be effective as of the Effective Date, but none of the releases shall release any Party of their obligations under this Settlement Agreement.

Section 13.  <u>Governing Law</u>.

This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin (without reference to its conflict of laws provisions), and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 14.  <u>Venue</u>.

Should any disputes arise under this Settlement Agreement, including the sequencing of the events set forth herein, the Parties agree that the exclusive venue for such disputes shall be the Bankruptcy Court.

Section 15.  <u>Indulgences; No Waivers</u>.

Neither the failure nor any delay on the part of a Party to exercise any right, remedy, power or privilege under this Settlement Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude other or further exercise of the same or any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power, or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the Party asserted to have granted such waiver.

Section 16.  <u>Headings Not to Affect Interpretation</u>.

The headings contained in this Settlement Agreement are for convenience and reference purposes only and shall not in any way be construed as effecting the meaning or interpretation of the text of this Settlement Agreement.

Section 17.  <u>No Drafting Party</u>.

No party shall be deemed the "drafting party" of this Settlement Agreement. Consequently, this Settlement Agreement shall be construed as a whole, according to its fair meaning and intent, and not strictly construed for or against any party hereto.

Section 18.  <u>Authority</u>.

Each person executing this Settlement Agreement on behalf of a Party represents and warrants that he or she has received all necessary power and authority to do so.

Section 19.  <u>Counterparts</u>.

This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.  Facsimile or electronically transmitted signatures shall be effective as originals.

Section 20.  <u>No Admission of Liability</u>.

The Parties agree that this Settlement Agreement is the compromise of disputed claims and agree that nothing in this Settlement Agreement shall be construed as an admission of any fault or liability by any Party.

**KPH Construction, Corp.**  **KPH Environmental, Corp.**


By: _____       By: _____
    Keith P. Harenda                      Keith P. Harenda
    Its President                            Its President


    **KPH Construction Services, LLC**    **Triple H Holdings, LLC**


By: _____       By: _____
    Keith Harenda                       Keith Harenda
    Its Managing Member                Its Managing Member


_____       _____
**Keith P. Harenda**                      **Keith P. Harenda**
In his personal capacity             On behalf of all entities that are
                                      "Insiders"

    **Hotel Northland Master Tenant, LLC**
By: Hotel Northland Master Tenant Managing Member LLC
    Its Managing Member


By: _____
    Keith P. Harenda
    Its sole member


    **Hotel Northland Master Tenant**
    **Managing Member LLC**


By: _____
    Keith P. Harenda
    Its sole member


**Hotel Northland Developer, LLC**

By: _____
    Keith P. Harenda
Its: _____

**Hotel Northland Special Member LLC**


By: _____
    Keith P. Harenda
Its: _____


**Hotel Northland Master Landlord Managing
Member, LLC**


By: _____
    Keith P. Harenda
Its: _____


**KPH Northland Hotel, LLC**


By: _____
    Keith P. Harenda
Its: _____


| | |
|---|---|
| **Hotel Northland, LLC** | **Receivership Estate for Hotel Northland, LLC** |
| | |
| By: _____ | By: _____ |
|   Paul Swanson, Chapter 128 for Hotel Northland, LLC |   Paul Swanson, Chapter 128 for Hotel Northland, LLC |
| | |
| **Liberty Mutual Insurance Company** | **U.S. Bancorp Community Development Corporation** |
| | |
| By: _____ | By: _____ |
| Its | Its |

**Octagon Credit Partners, LP**
  **By: Octagon Finance, LLC**
  **Its General Partner**

By: _____

  Its

**Octagon Finance, LLC**

By: _____

  Its

**304 North Adams Green Bay, LLC**
  **By: Greenwood Hospitality GB, LLC**
  **Its Managing Member**

By: _____

  Its

**304 North Adams Master Tenant, LLC**
  **By: Greenwood Hospitality GB, LLC**
  **Its Managing Member**

By: _____

  Its

Plan Addendum Page  32

17

**Addendum 7.1(a)**
**Executory Contracts and Unexpired Leases Assumed Under the Plan**

**<u>Description of the Unexpired Lease of Executory Contract</u>**                    **<u>Curage Amount</u>**

With KPH Construction:

| | |
|---|---|
| ACAR Leasing LTD d/b/a GM Financial Leasing | $ 0.00 |
| Braeger Chevrolet, Inc. | $ 0.00 |
| Braeger Ford Inc. | $ 0.00 |
| Bruce Real Estate LLC | $ 0.00 |
| Fields Pag, Inc. | $ 0.00 |
| JPMorgan Chase | $ 0.00 |
| Marsh & McLennan Agency | $ 0.00 |
| All work in process | $ 0.00 |

With Harenda:

| | |
|---|---|
| JPMorgan Chase Bank, N.A. | $ 0.00 |

**Addendum 7.1(c)**
**Contracts and Unexpired Leases Rejected Under the Plan**

<u>**Description of the Unexpired Lease of Executory Contract**</u>          <u>**Claim Amount**</u>

None